UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELLE MARSKI,

    Plaintiff,

    v.

COURIER EXPRESS ONE, INC., et al.,

    Defendants.

Case No. 19 CV 4132

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Marski brings suit against Defendants Courier Express One, Inc., PreCC, Inc., Vertek, LLC, Dispatch Express, Inc., and Anthony Urso, alleging: sex discrimination in violation of Title VII of the Civil Rights Act of 1964, disability discrimination in violation of the Americans with Disabilities Act (ADA), age discrimination in violation the Age Discrimination in Employment Act (ADEA), and sex, disability, and age discrimination in violation of the Illinois Human Rights Act (IHRA) (Counts I, III, VI and IX respectively); retaliation in violation of Title VII, the ADA, the ADEA, and the IHRA (Counts II, V, VII, and XI respectively); failure to accommodate under the ADA and the IHRA (Counts IV and X respectively); discriminatory conduct in violation of the Equal Pay Act (Count VIII); intentional infliction of emotional distress (Count XII); violation of the Illinois Wage Payment Collection Act (IWPCA) (Count XIII); violation of the Fair Labor Standards Act (FLSA) (Count XIV); violation of the Illinois Minimum Wage Law (IMWL) (Count

XV); violation of ERISA (Count XVI); violation of the Family and Medical Leave Act (FMLA) (Count XVII); and defamation (Count XVIII). [2].

Defendants Courier, Vertek, Dispatch Express, and Urso now move for summary judgment in favor of Courier on Counts I–XVII; in favor of Vertek and Dispatch Express on Counts I, III, VI, VIII, IX, XII, XIV, XV, and XVII; and in favor of Urso on Counts XII, XIV, XV, XVII, XVIII. [143]. Separately, Defendants PreCC and Urso move for summary judgment in favor of PreCC on Counts I, III, VI, VIII, IX, XII, XIV, and XV–XVII; and in favor of Urso on Counts XII, XIV, XV, XVII, XVIII. [149].

For the reasons explained below, this Court grants summary judgment in favor of Defendants on all counts.

## I.     Relevant Facts and Procedural History

### A.     PreCC

In May 2015, PreCC[1] hired Plaintiff to work as an administrative assistant to Pam Rebhorn, PreCC's Chief Operating Officer, at an hourly rate of $18.00. [173] ¶ 3; [197] ¶ 40. In February 2016, Plaintiff assumed the position of HR/Payroll Supervisor. [154] at 30–31; [172] ¶¶ 71–72. In connection with this change in position, PreCC increased Plaintiff's compensation from $18.00 per hour to an annual salary of approximately $48,100 (or $925 per week) with no overtime permitted. [154] at 31; [196] ¶ 72; [197] ¶ 43. In February 2017, Plaintiff's title changed from

---

[1] Although this Defendant was known as Premier CC, Inc. in May 2015, [192] ¶¶ 3, 4, this Court will refer to this entity as PreCC throughout this opinion to avoid confusion with Premier CC, LLC, a wholly distinct entity dismissed from this action in February 2021, [160].

HR/Payroll Supervisor to HR/Payroll Manager, and Premier increased her salary to $57,200 per year (or $1,100 per week). [154] at 31; [196] ¶ 76.

Although the parties dispute various aspects of Plaintiff's responsibilities as a Payroll Supervisor, and later Payroll Manager, the record clearly establishes that Plaintiff's responsibilities included training managers how to discipline employees; establishing payroll deadlines; creating "checks and balances to reduce the amount of manual checks"; holding "contractors accountable" for "money they owed Premier"; holding Premier "locations accountable for the timely reporting of PTO"; protesting and appealing worker's compensation and unemployment claims; requiring managers to document their verbal warnings to employees, interpreting FLSA to identify exempt employees; identifying instances of employee misconduct and violations of company policy; and "completely restructure[ing] payroll and HR." [151-3] at 23, 25–28, 32, 96, 98–100, 110; [151-4] at 41.

Plaintiff, who is now forty-seven, and suffers from migraine headaches and fibromyalgia, the latter since at least 2012, [146-2] at 23; [151-3] at 101; [172] ¶ 30, alleges that, while employed at PreCC, she experienced discriminatory treatment due to her sex, age, and disability status. Plaintiff contends that Defendant Urso, the Chief Operating Officer of PreCC, made discriminatory comments and subjected her to violent outbursts during her employment. [146] ¶ 42; [172] ¶ 3; [190] at 11. For example, in May 2017, Plaintiff alleges that Urso "threatened Marski's job and kicked a garbage bin into Marski's office" because Urso was displeased with the results of a company audit. [197] ¶ 56. Defendants PreCC and Urso deny this incident occurred.

3

*Id.* But Defendants PreCC and Urso admit that "Urso would yell when he got upset because business matters did not go his way, and he yelled at a lot of people regardless of age or gender." [192] ¶ 17.

Plaintiff further alleges Premier CC paid her wages lower than those of Richard Healy, the HR Director for Vertek LLC, an entity partially owned by Urso, even though she and Healy performed similar work. [192] ¶ 21; [197] ¶¶ 34, 47. The record shows that Healy and Plaintiff reported to different supervisors and contains no information regarding Healy's responsibilities as HR Manager, Healy's age, or Healy's disability status.

In addition, Plaintiff asserts Defendants interfered with her leave under the FMLA following surgery in December 2016. [197] ¶ 48. Plaintiff asserts that PreCC employees repeatedly contacted her about work-related issues and that company employees delivered work assignments to her house during her leave. *Id.* Defendants PreCC and Urso, on the other hand, deny that Plaintiff received work assignments while on leave, maintaining instead that Plaintiff requested to work from home because she could not afford unpaid leave. [192] ¶ 28.

Plaintiff contends that her FMLA leave was recertified through the end of January 2017, [192] ¶ 29, but that Defendant Urso contacted her in mid-January requiring her to attend a meeting in the office, [151] ¶ 30; [172] ¶ 79. Plaintiff states that she attended the meeting for fear of losing her job. [154] at 60–61. Defendants dispute this account, asserting that Plaintiff voluntarily came to the office for the meeting. [151] ¶ 30; [197] ¶ 50.

Plaintiff also claims that a PreCC employee disclosed Plaintiff's medical information to another individual. [192] ¶ 31.

Lastly, Plaintiff claims that, because she handled work matters during scheduled days off in December 2017, Urso permitted Plaintiff to roll over paid time off (PTO) accrued in 2017 into the 2018 calendar year. [197] ¶ 57. Defendants Urso and PreCC dispute this account. *Id.*

In July 2018, Plaintiff left PreCC after PreCC's sale to QualTek/NX Utilities. [197] ¶ 33.

### B. Courier Express One, Inc.

In July 2018, Urso hired Plaintiff to work as HR/Payroll Manager at his new logistics company, Courier Express One, Inc. [172] ¶ 9; [192] ¶ 5. Courier paid Plaintiff an annual salary of $62,400 (or $1,200 per week) again with no overtime permitted. [196] ¶91. As Payroll Manager, Plaintiff generally held the same responsibilities that she had at PreCC. [151-3] at 25.

Plaintiff alleges further employment discrimination based upon her sex, age, and disability, during her time at Courier. Plaintiff again contends that Defendant Urso made discriminatory comments and subjected her to violent outbursts during her employment. [172] ¶¶ 43–44, 46. Specifically, Plaintiff identifies a remark by Defendant Urso around the time of Plaintiff's birthday that Plaintiff was "so old," and a 2018 remark by Urso that he did not "know why we hire women" (in reference to a female employee who fell and injured herself on the job). *Id.* ¶ 42. Defendants Urso and Courier deny that Urso made these statements. [196] ¶ 96. But Plaintiff and

5

Defendants Courier and Urso concede that Urso "yelled at and complained about everyone" and that "Urso's outbursts were mainly directed at" Plaintiff and "one male employee." [172] ¶46.

In support of her employment discrimination claims against Courier and Urso, Plaintiff also repeats her assertion that she received lower compensation than Richard Healy, despite the two allegedly performing similar work. [196] ¶ 76. Additionally, Plaintiff asserts that Courier and Urso failed to give her a reasonable accommodation for her migraine headaches, other than allowing her to leave the office and work from home when she felt unwell. [172] ¶ 30.

Plaintiff also claims that Courier and Urso interfered with her paid time off (PTO). Specifically, Plaintiff states that she requested PTO days in December 2018 and January 2019, but that Courier and Urso ultimately required her to work during at least some of her time off. [196] ¶ 99. Defendants dispute this account, citing evidence that the work tasks identified by Plaintiff took place on days when she did not have scheduled PTO. *Id.*

Plaintiff stopped working for Courier in February 2019. [172] ¶ 28. The morning of February 5, 2019, Plaintiff sent Urso an email describing problems she was having with various company managers and stating that she had "no authority over anyone in this company." [196] ¶ 100. After receiving Plaintiff's email, Defendant purportedly called Plaintiff, yelled "You better never send another fucking email like that," and used other profanities. *Id.* ¶ 101. Following Defendant's phone call, Plaintiff felt ill and left the office to work from home. *Id.* ¶ 102.

Upon learning that Plaintiff had gone home, Defendant sent an email to Plaintiff at 9:01 a.m. stating: "I was just informed you left for the day. If you can't handle the job, let me know so I can find someone else." *Id.* ¶ 103. Plaintiff responded to Defendant's email that she felt threatened by his comments and was going to see her doctor. *Id.* ¶ 104. Defendant emailed Plaintiff at least two additional times that morning. *Id.* ¶¶ 105–106. He explained to Plaintiff that he hoped she felt better and requested that she inform him by the end of the day if she was quitting. *Id.* At 1:50 p.m., Plaintiff emailed Defendant her updated annual FMLA paperwork for 2019 but did not respond to Defendant's inquiries about whether she was quitting. *Id.* ¶ 107.

That afternoon, at 2:03 p.m., Defendant again emailed Plaintiff asking if she planned to quit and explaining he would assume she was quitting unless she informed him otherwise that day. *Id.* ¶ 108. Plaintiff continued to work on human resources-related items that afternoon and responded to an email from an employee at 6:20 p.m., on which she copied Defendant. *Id.* ¶¶ 109–111. Defendant sent Plaintiff a brief response indicating he received Plaintiff's 6:20 p.m. email. *Id.* ¶ 112. Plaintiff then sent another email directly in response to Defendant's inquiry about whether she was quitting. *Id.* ¶ 113. Plaintiff explained that, following her morning exchange with Defendant, she had informed other employees that she was taking an office laptop to work from home for the day. *Id.* In addition, she included a copy of a doctor's note indicating that she needed to take leave from work for two days. *Id.*

The following day, Plaintiff discovered that she no longer had access to her work email. *Id.* ¶ 116. Other Courier employees then told Plaintiff about a company-

wide email which stated that Plaintiff no longer worked for Courier. *Id.* ¶ 115. Later, on February 6, Plaintiff discovered in her personal email a message sent by Urso on February 5, at 10:30 p.m. *Id.* ¶ 117. In his email, Urso wrote that he assumed Plaintiff was resigning her position based upon her initial email to Defendant about problems with the company's managers and because she did not respond "in a reasonable timeframe" to his inquiry about whether she was quitting. *Id.*

Plaintiff and Defendants Courier and Urso dispute how Plaintiff's employment ended. Plaintiff asserts that she was fired from her job, in part, as retaliation for submitting a request for FMLA leave and complaining about discrimination. [190] at 9. In contrast, Defendants argue that Plaintiff resigned by failing to respond to Urso's emails to clarify if she was quitting. [172] ¶¶ 26–27. In any case, the parties agree that Plaintiff's employment with Courier ended on February 6, 2019. *Id.* ¶ 28.

### C. Plaintiff's Work for Other Entities Owned by Urso

During Plaintiff's employment at PreCC and Courier, Urso sometimes assigned her work for other entities in which Urso had an ownership interest. Specifically, Plaintiff asserts that she completed human resources-related work at the following businesses: (1) Vertek LLC, a telecommunications company, from July 2015 to August 2018; (2) Dispatch Express Inc., a dispatch call center, from February 2017 to February 2018 and from September 2018 to January 2019; and (3) SV Wilson, a freight delivery company, from fall 2018 to January 2019. [196] ¶¶ 61–68. Defendants dispute these assertions. *Id.*

### D. Post-Termination Events

Plaintiff asserts that her final paycheck following her separation from Courier failed to properly account for 120 hours of accrued PTO and her final wages. [172] ¶¶ 51–52; [192] ¶ 24. In addition, when Plaintiff did receive her last paycheck, it included no itemized list of deductions. [197] ¶ 89.

Plaintiff also claims that Defendant failed to send her timely information regarding COBRA coverage following her separation. [196] ¶ 119. Although Plaintiff's employment with Courier ended on February 6, 2019, she did not receive notification of her rights to continue her insurance coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) until approximately May 15, 2019. *Id.*

Plaintiff additionally asserts that Defendants Urso retaliated against her for her complaints about discrimination and for taking FMLA leave and by filing a lawsuit regarding a $4,000 payment Plaintiff received in 2018 during her employment at PreCC. *Id.* ¶ 90. In addition, Plaintiff asserts that Urso told another individual that Plaintiff was "mean and hateful" when discussing Plaintiff's separation from Courier. [172] ¶ 49.

### E. Procedural History

On March 7, 2019, Plaintiff filed charges of employment discrimination against Defendants with the Illinois Department of Human Rights and Equal Opportunity Employment Commission. [192] ¶ 2. In June 2019, after exhausting her administrative remedies, Plaintiff initiated this suit by filing an eighteen-count complaint and amended complaint against Defendants Courier, Premier CC, LLC

(Premier CC), PreCC, Vertek, Dispatch, and Urso.   [1] (initial complaint); [2] (amended and operative complaint).

Defendants all moved for summary judgment in three separate motions.  [138] (Premier CC); [143] (Courier, Dispatch, Vertek, and Urso); [149] (PreCC and Urso). Upon Plaintiff and Premier CC's joint stipulation of dismissal, this Court dismissed all claims as to Premier CC with prejudice and denied Premier CC's motion for summary judgment [138] as moot.  [160].

This Court now turns to the remaining motions for summary judgment, [143], [149].

## II.   Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020).  The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th

Cir. 2018).  To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019).  Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party.  *Anderson*, 477 U.S. at 252.

### III.  Discussion & Analysis

#### A.    Plaintiff's Employers

To make sense of Plaintiff's claims, and correctly apply the relevant statutes of limitations, this Court must first determine which Defendants employed Plaintiff and when.  Plaintiff asserts that she "was initially hired by Defendant [PreCC] Inc.," but that ultimately she "was working for multiple entities" because "Defendant Anthony Urso held interest in multiple entities, and on any given day, Marski was given tasks to perform by Defendant Urso, not necessarily knowing which entities' hat he was wearing when he was giving such orders."  [180] at 7–8.  Plaintiff's assertion that she worked for PreCC, Vertek, Dispatch, and Courier as joint employers, however, does not square with the law or the record.

As the Seventh Circuit notes, "for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee." *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008).  To determine whether a purported employer exercises such control, courts

consider factors such as whether the entity supervises a plaintiff's day-to-day activities; sets the plaintiff's compensation or working hours; directs the plaintiff while on the job; disciplines the plaintiff; or has any role in hiring, firing, promoting, or demoting the plaintiff.  *See, e.g.*, *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 361 (7th Cir. 2016) (discussing joint employment for purpose of ADEA claim); *Whitaker v. Milwaukee County*, 772 F.3d 802, 810 (7th Cir. 2014) (discussing joint employment for purpose of ADA claim); *Moldenhauer*, 536 F.3d at 645 (discussing joint employment for purpose of FMLA claim); *Nardi v. ALG Worldwide Logistics*, 130 F. Supp. 3d 1238, 1247–48 (N.D. Ill. 2015) (discussing joint employment for purpose of Title VII claim), *as amended* (Sept. 21, 2015); *Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 803–06 (N.D. Ill. 2013) (discussing joint employment for purpose of FLSA, IMWL, and IWPCA claims); *see also Egan v. Maguire*, 338 F. Supp. 3d 799, 801 (N.D. Ill. 2018) (noting that the Equal Pay Act is an amendment to the FLSA).

Here, the undisputed portions of the record show that Plaintiff worked for PreCC from May 18, 2015 until July 17, 2018, [146-2] at 24, 31; [192] ¶¶ 4–5, and then for Courier from July 18, 2018 until February 6, 2019, [151-7] at 6; [172] ¶ 28. While Plaintiff asserts that she occasionally prepared payroll for Vertek and Dispatch, *e.g.*, [172] ¶¶ 9, 64, she points to no evidence that any entity other than PreCC exercised control over her working conditions from May 18, 2015 to July 17, 2018, or that any entity other than Courier Express exercised control over her working conditions from July 18, 2018 to February 5, 2019.  In fact, during Plaintiff's

employment with PreCC, only PreCC maintained Plaintiff's employment records, set Plaintiff's working hours, and decided Plaintiff's compensation. *See* [146-2] at 69–70. The same is true of Courier during Plaintiff's employment with that Defendant. *See id.* Indeed, there exists no evidence that Vertek or Dispatch played any role in the decisions to hire Plaintiff for her roles at PreCC and Courier or in any decision to terminate her employment. And to the extent Plaintiff did perform tasks for Vertek or Dispatch, these tasks formed part of her PreCC (or Courier) workday. *Id.* at 69. Accordingly, neither Vertek nor Dispatch employed Plaintiff.

Additionally, even if Plaintiff could satisfy the requisite tests with respect to Dispatch, Dispatch would not constitute an employer for the purpose of Plaintiff's Title VII, ADA, ADEA, and FMLA claims, or Plaintiff's IHRA claims to the extent based upon age or sex discrimination, because Dispatch employed only approximately ten people. [146-3] at 19; [172] ¶ 5.[2]  This number falls short of the requirements for "employers" within the meaning of Title VII, the IHRA, the ADA, the ADEA, and the FMLA. 29 U.S.C. § 630 (minimum of twenty employees for ADEA "employer"); *id.* § 6211(4)(A) (minimum of fifty employees for FMLA "employer"); 42 U.S.C. § 2000e(b) (minimum of fifteen employees for Title VII "employer"); 775 Ill. Comp. Stat. 5/2-101(B) (minimum of fifteen employees for IHRA "employer" with exception for

---

[2] Although Plaintiff denies these facts, she cites no record evidence when doing so. [172] ¶ 5. Accordingly, this Court deems these facts admitted. *See Alvarado v. Corp. Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 938 n.1 (N.D. Ill. 2010). Vertek also states that it had too few employees to meet the relevant statutory definitions of employers. *Id.* ¶ 4. But on this issue, the record contains conflicting evidence. *E.g.*, [151-6] at 12 (testimony that Vertek has "close to" fifty employees).

discrimination based upon physical or mental disability);[3] 29 C.F.R. § 1630.2(e) (minimum of fifteen employees for ADA "employer").

Because neither Vertek nor Dispatch employed Plaintiff for the purpose of her Title VII, ADA, ADEA, Equal Pay Act, IHRA, FLSA, IMWL, and FMLA claims, this Court (a) grants summary judgment in favor of Vertek and Dispatch on Counts I, III, VI, VIII, XIV, XV, and XVII; (b) grants summary judgment in favor of Dispatch on Count IX, and (c) grants summary judgment in favor of Vertek on Count XVII.[4]

### B. Employment Discrimination (Counts I, III, VI, and IX)

#### 1. Time-Barred Claims as to PreCC

This Court first considers the timeliness of Plaintiff's discrimination claims against PreCC. A plaintiff proceeding under Title VII who "initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice" must file her charge "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Identical limitations periods apply to employment discrimination claims brought under the ADA, ADEA, and IHRA. 29 U.S.C. § 626(d)(1)(B); 42 U.S.C. § 12117(a); 775 Ill. Comp. Stat. 5/7A-102(A)(1).

---

[3] In other words, Dispatch would not constitute an employer for the purpose of Plaintiff's age and sex discrimination claims under IHRA, but potentially would constitute an employer for the purpose of Plaintiff's disability discrimination claim.

[4] Although a jury may find a defendant that did not employ a plaintiff liable for certain instances of FMLA retaliation, *see* 29 U.S.C. § 2915(b), Count XVII alleges only that Vertek interfered with Plaintiff's rights under the FMLA, [2] ¶¶ 199–208. Plaintiff does not bring a claim for FMLA retaliation against Vertek. *Id.*

Because Plaintiff filed an administrative charge alleging harassment, and age, sex, and disability discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights on March 7, 2019, her claims of employment discrimination must involve conduct occurring on or after May 11, 2018. [192] ¶ 2. With respect to Plaintiff's employment discrimination claims against Courier, these limitations periods pose no problem because Plaintiff worked for Courier from July 18, 2018 until February 5, 2019. [146-2] at 70–71; [151-7] at 6; [192] ¶ 5; [196] ¶ 61. These same limitations periods, however, doom Plaintiff's employment discrimination claims against PreCC. Although Plaintiff worked for PreCC until July 17, 2018, [146-2] at 31, she has not identified a single purported instance of discrimination occurring after May 11, 2018, *see* [151-7] at 6–7.[5] Because the relevant limitations periods here preclude Plaintiff's employment discrimination claims against PreCC, this Court grants summary judgment in favor of PreCC on Counts I, III, VI, and IX.

### 2. Sex, Disability, and Age Discrimination

To prove employment discrimination based upon her sex (under Title VII), disability (under the ADA), or age (under the ADEA), a plaintiff may use the framework developed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's

---

[5] Although Plaintiff denies that she is unable to "identify any alleged discriminatory/harassing conduct occurring between May 1, 2018 and July 17, 2018," she identifies no such conduct; nor does she cite any record evidence to contradict this fact. [192] ¶ 16. Accordingly, this Court deems this fact admitted.

15

legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (applying *McDonnell Douglas* framework to Title VII employment discrimination claims); *see also, e.g.*, *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718–19 (7th Cir. 2021) (ADEA claims); *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 286–87 (7th Cir. 2015) (ADA claims). Courts also apply this framework to IHRA claims based upon sex, disability, or age employment discrimination. *De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (noting that courts "evaluating claims of discrimination" brought under the IHRA "apply the same" methods used "by federal courts in evaluating causes of action brought pursuant to Title VII" or the ADEA). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the burden shifts back to the plaintiff to show that the employer's states reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir.), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit further explained how trial courts should employ the *McDonnell Douglas* framework. Under *Ortiz*, the core question in any employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016). When using this approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766). Under the requisite standard, Plaintiff's employment discrimination claims fail.

Given the record, Plaintiff's discrimination claims cannot survive summary judgment because she fails to identify a similarly situated employee. In the Seventh Circuit, "an employee is similarly situated only where he is directly comparable in all material aspects." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)*, overruled on other grounds*, *Ortiz*, 834 F.3d 760). Factors considered here "most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). And, of course, a "similarly situated employee" must not share a plaintiff's "race, sex, religion, or other protected status." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 656 (7th Cir. 2021).

Here, Plaintiff identifies Rick Healy (Vertek's HR Manager), [172] ¶ 19, as a purportedly similarly situated employee, [180] at 9; [190] at 9. While Healy does differ from Plaintiff with respect to sex, Plaintiff fails to identify any evidence whatsoever of Healy's age or disability. [192] ¶¶ 14, 15.[6] Absent such information, Healy cannot serve as a similarly situated employee for the purpose of Plaintiff's age and disability discrimination claims, and thus, Plaintiff fails to establish a prima facie case for these claims under the *McDonnell-Douglas* framework.

Nor could a reasonable jury consider Healy "directly comparable" to Plaintiff for purposes of her sex discrimination claims under Title VII and IHRA. Healy worked for Vertek while Plaintiff, as discussed above, did not. This fact alone prevents Healy from serving as a comparator. *See Taleyarkhan v. Purdue Univ.*, No. 10 CV 39, 2014 WL 4905443, at *14 (N.D. Ind. Sept. 29, 2014) ("Plaintiff cannot point to individuals not employed by defendant to demonstrate the existence of similarly situated employees."), *aff'd sub nom. Taleyarkhan v. Trs. of Purdue Univ.*, 607 F. App'x 548 (7th Cir. 2015); *see also Tate v. Ancell*, 551 F. App'x 877, 889 (7th Cir. 2014) (stating that a plaintiff "did not meet his burden under the *McDonnell Douglas* burden-shifting test to identify similarly situated employees who were treated more favorably than he was" where putative comparators had "wholly distinct positions and a different employer" than the plaintiff).

Moreover, Healy not only worked for a different employer, but he also reported to a different supervisor—his brother Andrew Healy. [146-8] ¶ 4; [172] ¶ 19. This

---

[6] Plaintiff denies that she is "unaware of the ages of other employees," but does so without identifying evidence in the record that would establish their ages. [192] ¶ 15.

difference also precludes Healy from serving as a similarly situated employee. *See, e.g., Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (finding that a plaintiff was not similarly situated to another employee where the plaintiff and the other employee were evaluated by different supervisors); *Radue*, 219 F.3d at 618 (finding that the lack of a common supervisor precluded a showing of similarity because when "different decision-makers are involved, two decisions are rarely similarly situated in all respects") (citations omitted).

Plaintiff also fails to establish Healy's education and experience and fails to identify his responsibilities or explain how his responsibilities compared to Plaintiff's. Plaintiff concedes that she has no knowledge of Healy's workload, [151-3] at 59, and the little evidence in the record only serves to distinguish Plaintiff's *duties* from those of Healy. Plaintiff states that Healy did *not* manage payroll for Vertek, [151-3] at 33, while payroll management formed one of Plaintiff's chief responsibilities at Courier, [172] ¶¶ 14, 16.[7] And Healy had customer-facing responsibilities, while Plaintiff did not. [192] ¶ 21; *Cordon v. Centex Homes¸* 835 F. Supp. 2d 543, 553 (N.D. Ill. 2011) ("With no information regarding Garcia's job duties or any comparison between Cordon's performance and Garcia's, Cordon has not met her burden of establishing that Garcia was similarly situated.").

---

[7] Because Plaintiff does not cite evidence when denying these facts, *see* [172] ¶¶ 14, 16; [192] ¶¶ 4, 6, 8, they are deemed admitted.

19

In short, the record precludes Plaintiff from establishing Healy as "similarly situated" under the law; and as such, she fails to identify a comparator for the purposes of her sex, age, and disability claims.

Plaintiff's discrimination claims also fail under *Ortiz*, because she fails to show the required connection between her sex, age, or disability and her discharge or any other adverse employment action. In fact, the only evidence Plaintiff offers in this regard is Urso's alleged statements that Plaintiff was "so old" and he didn't "know why he hire[s] women."[8] [197] ¶ 67. Without more, however, such stray remarks remain too remote in time to support Plaintiff's claims. *Seymour-Reed v. Forest Preserve Dist. of DuPage Cty.*, 752 F. App'x 331, 335 (7th Cir. 2018) ("stray remarks" will "not support an inference of discrimination" unless they are made "around the time of, or about, the adverse action.") (internal quotation omitted).[9]

In sum, because Plaintiff failed to show that a discriminatory animus motivated the adverse employment actions, her discrimination claims fail as a matter of law under *Ortiz*.

### 3.   Hostile Work Environment Theory

Plaintiff also alleges that Defendants' discriminatory and harassing conduct, based upon her sex, age, and disability, created a hostile work environment. To prove the existence of a hostile work environment, Plaintiff must show that: (1) she was

---

[8] The record contains no evidence of discrimination based upon any disability.

[9] Here, Urso allegedly made the first comment no later than April 20, 2018 (long before any alleged adverse employment action at Courier), [146-2] at 128, and the second comment in or about September 2018 (Plaintiff's last birthday while working under Urso at either PreCC or Courier). [197] ¶ 67.

subject to unwelcome harassment; (2) the harassment was based on a protected category; (3) the harassment was "severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive" work environment; and (4) that "there is a basis for employer liability." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019) (quoting *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)). Whether the harassing conduct meets this "severe or pervasive" bar depends upon the "severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).

Under the right circumstance, even a single instance of harassment based upon membership in a protected class may be enough to satisfy the "severe and pervasive" element. *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (addressing a sex discrimination claim). But mere "[o]ffhand comments, isolated incidents, and simple teasing" do not. *Johnson*, 892 F.3d at 900 (quoting *Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012)). Similarly, "rude, boorish, or arrogant" behavior not based upon a plaintiff's membership in a protected class will not suffice to show a hostile work environment. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002).

In support of her hostile work environment theory, Plaintiff asserts that, during her employment at Courier, Urso screamed and cursed at her. [197] ¶ 72. But

she offers no evidence whatsoever linking this conduct to her membership in a protected class. In fact, Plaintiff states that Urso's "rage" was mostly directed to her and Roger Mckelvey, Courier's CFO. [146-2] at 50. This fact further undercuts any argument that this behavior related to Plaintiffs sex, age, or disability.[10]

Plaintiff also asserts that Urso (possibly during Plaintiff's time at Courier) once made a remark about her age, calling her "so old." [197] ¶ 67. Though inappropriate, this stray remark falls far short of establishing "severe and pervasive" conduct under this circuit's jurisprudence. *See, e.g.*, *Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 902–03 (7th Cir. 2005) (holding that plaintiff's allegations of another employee engaged in a "daily non-ceasing quest to denigrate" female employees, which included incidents in which he "spoke down to her and other female employees," "made a reference to her 'tits,' " made various juvenile remarks or jokes about penises, and "told several new male employees to watch out because Ms. Moser likes good-looking men," did not rise to the level of creating an objectively hostile work environment); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (holding isolated, indirect incidents of racial harassment, such as the use of racial slurs in plaintiff's presence, not severe and pervasive enough to alter conditions of employment). Because Plaintiff fails to cite evidence that Courier subjected her to severe or pervasive conduct, this Court need not reach the question of employer liability.

---

[10] The record contains no evidence regarding McKelvey's age or disability that would establish that he and Plaintiff belonged to the same protected class.

No reasonable jury could find Courier liable for sex, age, or disability discrimination based upon the record here. Accordingly, this Court grants summary judgment in favor of Courier on Counts I, III, VI, and IX.

## C. Failure to Accommodate (Counts IV, X)

In her operative complaint, Plaintiff alleges that Courier failed to accommodate her disability in violation of the ADA and IHRA. [2] ¶¶ 95–102, 142–149. For Plaintiff to survive summary judgment on her failure to accommodate claims, she must point to evidence that, if believed by a jury, would demonstrate that: (1) she is a qualified individual with a disability; (2) her employer was aware of the disability; and (3) her employer failed to reasonably accommodate that disability. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (ADA claims); *see McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017) (applying identical standards to ADA and IHRA failure to accommodate claims).

In moving for summary judgment, Courier argues that Plaintiff did not need an accommodation. [155] at 8–9. Plaintiff failed to respond to this argument*, see generally* [190], thus conceding that she did not need an accommodation, *see Hartford Underwriters Ins. Co. v. Worldwide Transp. Shipping Co.*, 313 F. Supp. 3d 919, 925 (N.D. Ill. 2018) ("When a party does not respond to an argument it is deemed waived"); *see also Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Because a plaintiff's admission she "did not need" an accommodation renders her failure to accommodate claim "unavailing," *Johnson v. City of Chi. Bd. of Educ.*, 142 F. Supp. 3d 675, 691 (N.D. Ill. 2015), this Court grants summary judgment in favor of Courier on Counts IV and X.

### D. Title VII, ADA, ADEA and IHRA Retaliation Claims (Counts II, V, VII, and XI)

In Counts II, V, VII, and IX, Plaintiff alleges retaliation in violation of Title VII, the ADA, the ADEA, and the IHRA, respectively. Title VII prohibits employers from discriminating against an employee because they "opposed any practice made an unlawful employment practice by this subchapter," or because they "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). The ADA, ADEA, and IHRA contain identical prohibitions. *See* 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. § 12203 (ADA); 775 Ill. Comp. Stat. 5/6-101(A) (IHRA).

To prove her retaliation claims, Plaintiff must show that: (1) she engaged in protected activity; 2) she suffered a "materially adverse" employment action; and (3) there was a "causal link between the protected activity and the adverse action." *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 508–09 (7th Cir. 2020) (Title VII) (quoting *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018)), *reh'g denied* (Jan. 7, 2021); *see also Frey v. Hotel Coleman*, 141 F. Supp. 3d 873, 883–84 (N.D. Ill. 2015) (same standard for IHRA retaliation claim); *Holmes v. Godinez*, 311 F.R.D. 177, 231 (N.D. Ill. 2015) (same standard for ADA and ADEA retaliation

claims).[11]  As with employment discrimination claims, the core question for any retaliation claim should always be: "'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki*, 988 F.3d at 959 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

Plaintiff asserts that she engaged in protected activity by reporting discrimination against her to Jon Danielson (an individual who supervised Plaintiff during her employment at PreCC), and Roger McKelvey.  [180] at 9–10; [196] ¶ 7.  A report of discrimination to an employer can constitute protected activity, provided the report indicates that "the discrimination occurred because of" the employee's membership in "a protected class." *Sikba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)) (Title VII and ADEA).  But Plaintiff cites nothing at all when claiming that she reported discrimination to Danielson and McKelvey, [172] ¶ 41, and the record reveals no evidence of such reports.[12]  These evidentiary failings undermine Plaintiff's retaliation claims.

Even assuming that Plaintiff *could* establish protected activity, she offers no factual support for her bare assertion that "there most certainly is a causal

---

[11] Plaintiffs may also use the *McDonnell Douglas* framework to establish a prima facie case of retaliation.  *See, e.g.*, *Madlock*, 885 F.3d at 472.  But her  failure to identify a similarly situated employee dooms her claim here as well.

[12] Although the record does indicate that Plaintiff complained of discrimination against her by Courier employees other than Urso, Plaintiff explicitly states that she did not know why these other employees mistreated her.  [151-3] at 56–57.  More importantly, there is no evidence that, in making these complaints, she indicated that the mistreatment occurred because of her membership in a protected class.

connection" between the "protected activity and the adverse employment action," [190] at 9 (namely the termination of her employment and Urso's subsequent suit against her for her alleged failure to repay a loan). Plaintiff identifies no evidence that Urso terminated her employment because of her purported complaints of discrimination, or that Urso even had knowledge of these complaints. The mere fact that an adverse employment action takes place at some point after protected activity does not suffice to establish causality. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 888 (7th Cir. 2016) (noting that "temporal proximity" between protected activity and punitive action "is rarely sufficient to establish a causal connection" absent "additional evidence") (internal quotation omitted).

Because Plaintiff cannot establish a prima facie case of retaliation under Title VII, the ADA, the ADEA, or the IHRA, this Court grants summary judgment in favor of Courier on Counts II, V, VII, and XI.

### E. Equal Pay Act (Count VIII)

The Equal Pay Act prohibits an employer "from discriminating between its employees by paying an employee lower wages than the employer pays an employee of the opposite sex." *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018) (citing 29 U.S.C. § 206(d)(1)). To make out a prima facie case, "an employee must demonstrate 'a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (quoting *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir.

26

2012)).  To determine the comparability of work between employees of the opposite sex, a jury must have "evidence of characteristics like 'what [the male employees'] duties were, when they started work, where they worked, and what their backgrounds were.'" *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) (alterations in original) (quoting *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 657 (7th Cir. 2010)).  Absent such evidence, "an Equal Pay Act discrimination claim cannot survive summary judgment." *Id.*

Like her other claims, Plaintiff's Equal Pay Act claim suffers from a lack of evidence.  Here, Plaintiff identifies Rich Healy as someone who purportedly did identical work, *e.g.*, [180] at 9; but, as noted above, Healy worked for Vertek and Plaintiff did not. *See*, 29 U.S.C. § 206(d)(1) (prohibiting wage discrimination on the basis of sex by *an employer*).  Likewise, even if Healy and Plaintiff had worked for the same employer, the record fails to show that Healy constitutes a "similarly situated" employee where Plaintiff identifies no evidence regarding Healy's duties or experience.  Quite simply, Plaintiff fails to show that Healy performed "equal work" within the meaning of the Equal Pay Act, and thus, fails to create a triable issue on that claim.  *See Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 617 (5th Cir. 2020) (Because plaintiff points to "no evidence of how her job duties compared" to comparator's duties, she cannot use the "alleged disparity between her salary" and the comparator's to further her Equal Pay Act wage discrimination claim.); *see also Spencer v. Va. State. Univ.*, 919 F.3d 199, 207 (4th Cir.) (describing the "Equal Pay Act's equality requirement" as more demanding than "Title VII's similarity

27

requirement") (internal quotations omitted), *as amended* (Mar. 26), *cert. denied,* 140 S. Ct. 381 (2019).

For these reasons, this Court grants summary judgment in favor of Courier and PreCC on Count VIII.

### F.   Intentional Infliction of Emotional Distress (Count XII)

To establish a prima facie case for intentional infliction of emotional distress (IIED) under Illinois law, a plaintiff must show: (1) that the defendant's conduct "was truly extreme and outrageous," (2) that "the defendant intended to inflict severe emotional distress," and (3) that "the defendant's conduct did in fact cause severe emotional distress." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017). But "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," do not constitute extreme and outrageous conduct for the purposes of an IIED claim. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). When determining whether conduct is sufficiently extreme and outrageous, courts "avoid imposing liability for" a plaintiff's "idiosyncratic and individualized reactions" by using "'an objective standard based on all the facts and circumstances of a particular case.'" *Richards*, 869 F.3d at 567 (quoting *Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003)).

Plaintiffs seeking to prove IIED in the employment context face even higher hurdles. In this context, Illinois courts limit "recovery to cases in which the employer's conduct has been truly egregious." *Id.* (quoting *Van Stan v. Fancy Colours*

28

& Co., 125 F.3d 563, 568 (7th Cir. 1997)). In fact, "there is general hesitation 'to find intentional infliction of emotional distress in the workplace because, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have'" an actionable IIED claim. *Id.* (quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006)). And, as the Seventh Circuit notes, absent "conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 288 (7th Cir. 2015).

Here, Plaintiff cannot establish a prima facie case because the conduct at issue falls far short of the "extreme and outrageous" bar. Indeed, Plaintiff does not describe any specific conduct to substantiate her IIED claim. Instead, Plaintiff relies upon the same facts underlying her discrimination claims, that is, Urso's verbal abuse and profanity toward Plaintiff. [2] ¶ 158; *see also* [180] at 12 ("In addition, based on the facts so cited within regarding Defendants' outrageous, abusive, and violent conduct via Urso, Marski's IIED claims are supported"). But none of the alleged conduct rises to the level of extreme and outrageous, especially in the context of an employer-employee relationship. *See, e.g.*, *Richards*, 869 F.3d at 567–68 (affirming district court's entry of summary judgment against plaintiff on her IIED claim against her employer where alleged conduct did not "amount to 'extreme and outrageous'

misconduct under Illinois law" despite insulting remarks by supervisors and a physical incident in which a manager grabbed an item off the plaintiff's chest). As such, this Court grants summary judgment in favor of all Defendants on Count XII because no reasonable jury could find in favor of Plaintiff on her IIED claim.

### G.  Illinois Wage Payment and Collection Act (Count XIII)

To establish an Illinois Wage Payment and Collection Act (IWPCA) claim, Plaintiff must demonstrate that she is "owed compensation from defendants pursuant to an employment agreement." *Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) (quoting *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016)). Under IWPCA, an "agreement" is "'broader than a contract,' and 'requires only a manifestation of mutual assent on the part of two or more persons.'" *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1176 (N.D. Ill. 2016) (quoting *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004)), *aff'd*, 843 F.3d 660 (7th Cir. 2016). The IWPCA requires employers to honor their employment contracts and agreements and provide any agreed-upon compensation. *Id.* at 1175 (citing 820 Ill. Comp. Stat. 115/2). But the IWPCA "provides no substantive relief beyond what the underlying employment contract requires." *Enger*, 812 F.3d at 570.

Here, Plaintiff brings a claim under the IWPCA for: (1) Courier's failure to pay her for paid time off (PTO) for 2018 and 2019; and (2) Courier's failure to pay her wages she earned from February 3 through 5, 2019. [2] ¶¶ 162–169.

As to this claim, the record contains undisputed evidence that PTO accrued under a "use it or lose it" policy, whereby employees forfeited any "PTO not used prior

30

to the end of the year," and that PTO accrued on an as-you-go basis each calendar year. [172] ¶ 60; *see* [146-2] at 20, 39, 117. Plaintiff asserts that Plaintiff and *PreCC* agreed to roll over Plaintiff's 2017 accrued PTO to the 2018 calendar year, e.*g.*, [197] ¶ 57, but she identifies no evidence of an agreement to roll over PTO accrued during her time at PreCC *to Courier;* nor does she identify evidence of an agreement to roll over her PTO at the end of 2018 (whether accrued at PreCC or Courier) to 2019. Because any alleged rollover of Plaintiff's PTO (from 2017 and 2018 to the 2019 calendar year) does not fall within the scope of the employment agreement (with PreCC or with Courier), Plaintiff cannot avail herself of the IWPCA.

As to Plaintiff's PTO accrued in 2019, Plaintiff's IWPCA claim survives only if she can show that a genuine dispute exists as to her PTO compensation under her employment agreement. She cannot. The record shows that Plaintiff, as a new employee of Courier, could accrue a maximum of forty PTO hours in a calendar year, [146-2] at 117, and that by February 6, 2019, the date of her separation, Plaintiff had used more PTO than she could have accrued under an "as you go" system, *see* [146-2] at 11, 65 (showing that Plaintiff took a portion of the day off on February 5, 2019 per her doctor's instructions); [193-2] at 58 (same); [193-3] at 46 (showing that Plaintiff used eight hours of PTO on January 2, 2019). Plaintiff identifies no countervailing evidence to place these facts in dispute.

Plaintiff's IWPCA claim also fails to the extent she bases it upon the alleged failure to pay wages earned in 2019. Plaintiff offers no evidence that her final paycheck fell short of the amount owed to her by Courier. *See also* [146-2] at 32

31

(noting Plaintiff's inability to determine whether her final paycheck from Courier reflected "the full amount" due).

Absent any record evidence that Courier failed to pay Plaintiff her full wages or accrued PTO, no reasonable jury could find in favor of Plaintiff on her IWPCA claim. Accordingly, this Court grants summary judgment in favor of Courier and PreCC on this claim.

### H. FLSA and IMWL (Counts XIV and XV)

Under the FLSA, employers must compensate certain nonexempt employees for time worked in excess of forty hours during a given workweek "at a rate not less than one and one-half times the regular rate." *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1219–20 (N.D. Ill. 2017) (quoting 29 U.S.C. § 207(a)). Employees exempt from this rule include individuals "employed in a bona fide executive, administrative, or professional capacity." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 109 (N.D. Ill. 2013) (quoting 29 U.S.C. § 213(a)(1)). The "administrative exemption" applies to employees "who earn at least $455 per week, who perform primarily office or non-manual work related to management, and who exercise discretion and independent judgment." *Id.* (29 C.F.R. § 541.200(a)).[13] Human

---

[13] The salary threshold for the executive and administrative exemptions now stands at $684 per week, 29 C.F.R. §§ 541.100(a), 541.200(a), but this threshold was not in place during Plaintiff's employment at PreCC and Courier. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51,231, 51,231–32, 51,235 (Sept. 27, 2019). Plaintiff met this higher threshold as well. *See* [154] at 30–31; [172] ¶¶ 71–72; [196] ¶ 72; [197] ¶ 43 (In February 2016, Plaintiff assumed the position of HR/Payroll Supervisor, making approximately $48,100, or $925 per week); [154] at 31; [196] ¶ 76 (In February 2017, Plaintiff's title changed from HR/Payroll Supervisor to HR/Payroll Manager, and Premier increased her salary to $57,200 per year, or $1,100 per week).

resource managers "who formulate, interpret or implement employment policies" will "generally meet the duties requirements for the administrative exemption." 29 C.F.R. § 541.203(e). The burden of establishing that an exemption applies falls upon the employer. *Id.* (citing *Schaefer-LaRose v. Eli Lilly & Co.,* 679 F.3d 560, 574 (7th Cir. 2012)). Because the IMWL contains the same requirements with respect to overtime and incorporates the FLSA standards, *see* 820 Ill. Comp. Stat. 105/4a, this Court considers together Plaintiff's FLSA and IMWL claims for unpaid overtime.

To prevail on her FLSA and IMWL claims, a nonexempt employee must first show that "she worked overtime without compensation" by either identifying records that establish "the amount of uncompensated time," in the event the "employer keeps accurate records," or by producing "'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,'" in the event the "employer kept inaccurate records." *Brown*, 246 F. Supp. 3d at 1220 (quoting *Melton v. Tippecanoe Cty.*, 838 F.3d 814, 818 (7th Cir. 2016)). The employee must also show that her "employer had actual or constructive knowledge about her overtime work." *Id.*

In this case, the record confirms that the Plaintiff falls squarely within the FLSA's administrative exemption. Plaintiff's salary while at PreCC and Courier exceeded the threshold for the administrative exemption.[14] [151-3] at 31, 34–35, 37. Moreover, Plaintiff's responsibilities at PreCC included training managers how to discipline employees; establishing payroll deadlines; creating "checks and balances to

---

[14] Plaintiff denies that her salary at PreCC met this threshold, but she cites no record evidence to substantiate this claim. [192] ¶ 7.

reduce the amount of manual checks"; holding "contractors accountable" for "money they owed Premier"; holding Premier "locations accountable for the timely reporting of PTO"; protests and appeals of worker's compensation and unemployment claims; requiring managers to document their verbal warnings to employees, interpretation of FLSA to identify exempt employees; identifying instances of employee misconduct and violations of company policy; and "completely restructure[ing] payroll and HR." [151-3] at 23, 25–28, 32, 96, 98–100, 110; [151-4] at 41. At Courier, Plaintiff generally performed the same responsibilities. [151-3] at 25.

While Plaintiff denies that she held such duties and responsibilities, she fails to identify any evidence in the record that contradicts these facts, and thus they are deemed admitted. [172] ¶¶ 12, 14–16; [192] ¶ 6. Although Plaintiff *does* cite evidence showing that other employees had duties falling within the administrative exemption, *id.*, the fact that *other* employees had administrative duties does not create a genuine dispute of material fact as to *Plaintiff's* duties. On this record, no reasonable jury could find Plaintiff to be a nonexempt employee, of either PreCC or Courier, within the meaning of FLSA. Accordingly, this Court grants summary judgment in favor of Defendants on Plaintiff's FLSA and IMWL claims.

## I. ERISA (Count XVI)

Plaintiff fails to specifically articulate any violation of ERISA in Count XVI of her Amended Complaint or in response to the pending motions for summary judgment. Instead, Plaintiff refers only to PreCC and Courier's failure to meet the requirements of the Consolidated Omnibus Budget Reconciliation Act (COBRA).

34

Although, Plaintiffs generally may not amend their complaints through arguments in summary judgment briefs, *see Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012), courts should allow a new claim to proceed if the claim merely adds a new legal theory based on facts already found within the complaint, *see Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). Here, the Defendants named in Count XVI addressed this Count as a COBRA claim in moving for summary judgment. [150] at 13; [155] at 12. Thus they will not be prejudiced if the Court construes Plaintiff's ERISA claim as a COBRA claim, and the Court accordingly does so.

Under COBRA, an employer must notify the administrator of an employee benefit plan any time an employee experiences a "qualifying event," such as termination of a covered employee's employment, within thirty days of that event. 29 U.S.C. §§ 1163, 1166(a)(2). Within fourteen days of receiving that notice, the plan administrator must notify the employee that she may has the right to continue her insurance benefits for a period of up to eighteen months. *Id.* § 1166(a)(4)(A), (c). The employee then has sixty days from the date on which coverage terminated, or the date upon which she received notice, to elect to continue her insurance. *Id.* § 1162(2)(A)(i).

Where a Plaintiff establishes a failure to provide notice as required by COBRA, she may recover actual and statutory damages. 29 U.S.C. § 1132(c)(1). But plaintiffs can recover damages only from *plan administrators*, not employers. *See* 29 U.S.C. § 1132(c)(1) ("Any *administrator* . . . who fails to meet the requirements of . . . section 1166 of this title . . . may in the court's discretion be personally liable to such

participant on beneficiary in the amount of up to $100 a day from the date of such failure . . . and the court may in its discretion order such other relief as it deems proper.") (emphasis added); *see also Vincent v. Wells Fargo Guard Servs., Inc.*, 44 F. Supp. 2d 1302, 1305 (S.D. Fla. 1999) (noting that employer defendants, "who are not the plan administrators, cannot be liable under 29 U.S.C. § 1132(c)"); *Anyachebelu v. Brooklyn Hosp. Ctr.*, No. 16-CV-3159, 2017 WL 9511073, at *17–20 (E.D.N.Y. July 20, 2017) (same), *report and recommendation adopted by* 2017 WL 423303 (E.D.N.Y. Sept. 22, 2017). In addition, at the summary judgment stage, a plaintiff's failure to establish damages will defeat her COBRA claim even if she demonstrates a "technical violation of Section 1166(a)(2)." *Guernsey v. City of Lafayette*, No. 13-CV-00086, 2016 WL 8729344, at *12 (N.D. Ind. Aug. 12, 2016).

Here, Plaintiff's employment with Courier ended on February 6, 2019, and she received her COBRA notice package about continuation coverage from Blue Cross Blue Shield (BCBS) on or before May 15, 2019. [172] ¶ 28; [196] ¶ 119. While this timeline might raise an inference that Defendants technically violated COBRA, Plaintiff's claim fails because she identifies no evidence of any economic injury or damages, such as out-of-pocket expenses, resulting from the delayed notice.

Furthermore, even if Plaintiff could claim damages, she may not recover from the Defendants she named in this lawsuit. Plaintiff brings her COBRA claim against PreCC and Courier, but neither Defendant constitutes a plan administrator for the purposes of COBRA. *See* [192] ¶ 26 (admitting that BCBS was the plan

36

administrator). For these reasons, this Court grants summary judgment in favor of PreCC and Courier on this claim. *See* 29 U.S.C. § 1132(c)(1).

### J.   FMLA (Count XVII)

In Count XVII, Plaintiff alleges that PreCC and Courier interfered with her rights under the FMLA and that Courier and Urso retaliated against her after she sought to exercise her rights under the FMLA. [2] ¶¶ 199–208. Plaintiff also claims that Urso "is individually liable under the FMLA" for PreCC and Courier's violations of the Act. *Id.* ¶ 207.

Under the FMLA, an eligible employee who takes leave due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee" has the right "to be restored by the employer to the position of employment held by the employee when the leave commence" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. §§ 2612(a)(1)(D), 2614(a). The Act also provides that the taking of FMLA leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id.* § 2612(a)(2).

The FMLA "makes it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right' provided in'" the Act. *Hickey v. Protective Life Corp.*, 988 F.3d 380, 386 (7th Cir. 2021) (quoting 29 U.S.C. § 2615(a)(1)). The FMLA "also makes it 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice

made unlawful by'" the Act. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 819 (7th Cir. 2015) (quoting 29 U.S.C. § 2615(a)(2)).

### 1. PreCC

Plaintiff's FMLA interference claim against PreCC fails, because it falls outside of the FMLA's statute of limitations. A claim under the FMLA may be brought no "later than 2 years after the date of the last event constituting the alleged [FMLA] violation." 29 U.S.C. § 2617(c)(1). If Plaintiff can establish a willful violation of the FMLA, the statute of limitations extends to three years. *Id.* § 2617(c)(2). Here, Plaintiff bases her FMLA interference claim against PreCC upon conduct occurring from December 2016 through January 2017. [2] ¶¶ 23–33. Because this conduct falls outside of the two-year statute of limitations, Plaintiff's claim survives only if a reasonable jury could find that PreCC's conduct constituted a willful violation of the FMLA.

A plaintiff can prove a "willful" violation of the FMLA, and thus avail herself of the Act's three-year statute of limitations, only by showing that "her employer either knew the FMLA prohibited its conduct or showed reckless disregard for whether it did." *Sampra v. U.S. Dep't of Transp.*, 888 F.3d 330, 334 (7th Cir. 2018). According to Plaintiff, PreCC violated the FMLA by requiring her to work and to come into the office during her FMLA leave and because one of its employees disclosed confidential information about Plaintiff's medical condition. [192] ¶¶ 28–31, 48–51. Although this evidence might support a claim that PreCC interfered with Plaintiff's FMLA rights, it simply does not suffice to demonstrate that PreCC's conduct was

done with knowing or reckless disregard of the FMLA's protections. Absent such evidence, the FMLA's two-year statute of limitations controls and bars Plaintiff's FMLA claim to the extent it alleges interference by PreCC. *See Sampra*, 888 F.3d at 334 (affirming grant of summary judgment in favor of defendants on plaintiff's FMLA interference claim where plaintiff "failed to offer evidence sufficient to rely on the three-year limitation for willful violations" and the FMLA's two-year statute of limitations thus barred her claim). The statute of limitations also bars Plaintiff's FMLA interference and retaliation claims against Urso where they rely upon the same conduct discussed above.

### 2. Courier

Plaintiff's FMLA claim against Courier fails because she cannot establish eligibility "for the FMLA's protections." For coverage under the FMLA, an employee must have "been employed by the employer for at least 12 months." 29 C.F.R. § 825.110. Here, the undisputed evidence shows that Plaintiff began working for Courier on July 17 or July 18, 2018 and that her employment ended on February 6, 2019. [172] ¶¶ 9, 28. As this roughly seven-month period falls short of the statutory requirements for eligibility, Plaintiff's FMLA interference claim against Courier cannot proceed. Likewise, her FMLA interference claim against Urso fails where she bases it upon conduct that occurred during her employment at Courier.

Lastly, Plaintiff's ineligibility for relief under the FMLA also dooms her retaliation claims against Courier and Urso. Where a plaintiff fails "to create a triable issue as to whether she was an 'eligible employee' under the FMLA," her

FMLA retaliation claim necessarily also fails.  *Brown v. Pitt Ohio Exp., LLC*, No. 12-CV-2420, 2013 WL 5221483, at *3 (N.D. Ill. Sept. 16, 2013) (collecting cases); *see also Jones v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 17-CV-5879, 2018 WL 1508529, at *5 (N.D. Ill. Mar. 27, 2018) (same).

Because no reasonable jury could find in favor of Plaintiff on her FMLA interference and retaliation claims, this Court grants summary judgment in favor of PreCC, Courier, and Urso on Count XVII.

### K.  Defamation (Count XVIII)

Defendant Urso moves for summary judgment in his favor on Plaintiff's defamation claim against him.  Under Illinois common law, "defamation is 'the publication of a false statement that tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person.'"  *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1061 (N.D. Ill. 2019) (quoting *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009)).  But "unprovable statements and statements of opinion" will not "give rise to a defamation claim" because Illinois law requires that an allegedly defamatory statement "contain an objectively verifiable factual assertion."  *Lifton v. Bd. of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005).  Additionally, unless the statement is "so obviously harmful that injury to the plaintiff's reputation can be presumed" (a type of defamation known as per se defamation), a plaintiff must prove that an alleged defamatory statement "caused him harm."  *Id.* (quoting *Lott*, 556 F.3d at 568).

As with her other claims, Plaintiff lacks sufficient evidence to overcome summary judgment on her defamation claim. Plaintiff bases her defamation claim solely upon the assertion that Urso told another individual that Plaintiff left Courier because she was "mean and hateful." [151-3] at 70; [172] ¶ 49. Yet this statement constitutes a statement of opinion devoid of objectively verifiable facts, and Plaintiff offers no evidence that the statement caused her harm. For these reasons, Plaintiff's claim fails and this Court grants summary judgment in favor of Urso on Count XVIII.[15]

## IV.  Conclusion

For the reasons stated above, this Court grants Defendants' motions for summary judgment [143], [149], and directs the Clerk to enter judgment in favor of Defendants on all counts. The Court strikes all set dates and deadlines. Civil case terminated.

Dated: September 29, 2021                  Entered:

_John Robert Blakey_
John Robert Blakey
United States District Judge

---

[15] In addition to seeking summary judgment on each claim or category of claims, Defendants invoke the rule against claim-splitting and ask this Court to grant summary judgment in their favor on all claims Plaintiff asserted in this suit that she did not bring against these four Defendants. [155] at 3–4. Claim splitting generally applies only when a plaintiff has filed a second action, however, e.g., Conley v. Windows, LLC of Ind., No. 12-CV-02572, 2021 WL 2256262, at *5 (S.D. Ind. June 3, 2021) (quoting Hobbs v. Dart, No. 20-CV-6513, 2021 WL 1906465, at *3 (N.D. Ill. May 12, 2021)), and Defendants do not identify a second pending case here; the Court thus declines to enter judgment on this basis. These Defendants also seek partial summary judgment on damages. [155] at 13–14. But because this Court has granted Defendants summary judgment on all liability issues, this Court denies as moot their motion for partial summary judgment on damages.